Ilgenfritz v. Ilgenfritz.

## ILGENFRITZ v. ILGENFRITZ, et al., Appellants.

### In Banc, June 6, 1893.

1. **Husband and Wife:** PURCHASE OF LAND: TRUST. Where land is purchased by a husband and at his direction the conveyance is made to the wife, and there is no agreement that it is to be held in trust for the husband he is presumed to have intended the land as a provision for and a settlement on his wife for her benefit.

2. ————: ————: BURDEN OF PROOF. The burden is on a husband receiving a deed to land from his wife to show that it was the result of her free will and consent after a full disclosure of all the facts and circumstances attending the transaction.

3. ————: ————: SETTING ASIDE DEED. In an action brought by a married woman against her husband and his brother to set aside her conveyance of land to the brother, it appeared that the deed was made at the request of the husband who represented that in consideration of the land his brother would transfer to him an interest in an established business from which he would receive sufficient income to support his wife and children and that such income was necessary to enable him to support them. The wife at the time was living apart from her husband and at her father's house. Before the execution of the deed, the husband entered into a written agreement providing that in consideration of the wife signing the deed he would pay her thirty dollars a month during the time they were separated, and stating that the interest in the brother's business had been turned over to him. The monthly allowance was paid for seven months only and the interest in the business of the brother was not transferred to the husband until after this action was commenced. *Held,* that the deed was properly set aside on the ground of imposition and misrepresentation.

*Appeal from Pettis Circuit Court.*

AFFIRMED.

*William S. Shirk* for appellants.

(1) The petition alleges no facts which amount to false or fraudulent representations. Mere promises and assertions of hopes and beliefs do not constitute false or fraudulent representations. Bishop on Contract Law, secs. 324, 326; *Terry v. Ins. Co.*, 3 Mo. App. 595; *Morrison v. Koch*, 32 Wis. 254; *Dawe v. Morris*, 149 Mass. 188; *Gage v. Lewis*, 68 Ill. 604; Kerr on Fraud and Mistake [2 Ed.], 42. (2) The undisputed evidence shows that the title to the land in question was placed in Mrs. Ilgenfritz for the sole purpose of providing a home for her and for her husband and their children against any financial reverses that might overtake him and that it was not her equitable separate estate. Equity will not interfere. *Black v. Black*, 30 N. J. Equity, 215; *Meldrum v. Meldrum*, 15 Col. 478. (3) The husband having paid every dollar for the land in question and the wife having left him and his home, she is not entitled to the benefits of the homestead. *Burnes v. Lewis*, 13 S. E. Rep. 123.

*Jackson & Montgomery* for respondent.

(1) The conveyance of the property in question to the plaintiff was a settlement upon her, and vested the title in her so that the settlement could not afterwards be revoked. Schouler on Husband and Wife, secs. 217, 383, 385 and 387; 2 Pomeroy's Equity, sec. 1039; *Alexander v. Warrance*, 17 Mo. 228; *Hollocher v. Hollocher*, 62 Mo. 268; *Seibold v. Christman*, 75 Mo.

308; *Wood v. Broadley*, 76 Mo. 31; *Shuster v. Shuster*, 93 Mo. 444; *Turner v. Shaw*, 96 Mo. 27. (2) The procuring the title to this property from the plaintiff, in the manner in which it was done, was a fraud, for which the conveyance should be avoided and the title re-vested in plaintiff. *First.* Equity looks with suspicion upon transactions between husband and wife, especially where the advantage is against the wife, and the courts do not require as strong evidence of fraud in such a case, as in others. 1 Story on Equity, secs. 218, 307 and 308; 2 Pomeroy's Equity, secs. 955 to 963; 2 Bishop on Married Women, sec. 478; *Witbeck v. Witbeck*, 25 Mich. 439; *Taylor v. Taylor*, 8 How. 200. *Second.* A false promise to a wife made to procure a deed from her is a fraud sufficient to entitle her to relief. 2 Pomeroy's Equity, sec. 877; Cooley on Torts, sec. 487; *Bear v. Stahl*, 61 Mich. 203. *Third.* Insufficient consideration will always be considered in cases of fraud but in a case of fraud of the husband upon his wife, such fact is entitled to unusual weight. Pomeroy's Equity, secs. 925 and 927 and note; *Robinson v. Robard*, 15 Mo. 459; *Curd v. Lackland*, 49 Mo. 451; *Durfee v. Moran*, 57 Mo. 349; *Phillips v. Stewart*, 59 Mo. 491; *Nelson v. Betts*, 21 Mo. App. 219. (3) The defendant, C. E. Ilgenfritz, was not an innocent purchaser. To avail himself of such a defense, he should plead and prove that he paid the consideration without notice of the fraud. *Halsa v. Halsa*, 8 Mo. 303; *Paul v. Fulton*, 25 Mo. 156; *Wallace v. Wilson*, 30 Mo. 340; *Aubuchon v. Bender*, 44 Mo. 560; *Bishop v. Schneider*, 46 Mo. 482; *Amholt v. Hartwig*, 73 Mo. 485; *Dougherty v. Cooper*, 77 Mo. 532; *Young v. Kellar*, 94 Mo. 581. This he did not do in this case. There is no pretense of even an indirect payment until long after this suit was brought against him.

GANTT, J. — This is a suit in equity by Mrs. Belle McNair Ilgenfritz against her husband, W. D. Ilgenfritz, and his brother, C. E. Ilgenfritz, to set aside a deed, made by herself and husband to the brother, C. E. Ilgenfritz, by which they conveyed to him a house and lot in the city of Sedalia and to re-vest the title thereto in plaintiff. The circuit court gave plaintiff a decree as prayed and defendants appeal.

The plaintiff lived in St. Louis prior to her marriage, and her husband resided in Sedalia. After the marriage they went to Sedalia to live. In June, 1884, and during the coverture, the husband, W. D. Ilgenfritz, with his own means, purchased the lot of ground in question and caused it to be conveyed directly to his wife, the plaintiff, by a general warranty deed without words limiting it to her sole and separate use. Afterwards with his own money he erected a dwelling house on this lot.

Plaintiff and her husband did not live happily together and in the latter part of November, 1887, she left him and returned to her father's house in St. Louis, where, according to all the testimony, she has since continued to reside. On the fifth of December her husband followed her to St. Louis. He took with him a deed that he had caused to be drawn, to the lot in question. He sought an interview with plaintiff and represented to her that it was necessary to enable him to support her and their children for them to sell their home, the house and lot in suit; that his brother and co-defendant, C. E. Ilgenfritz, who was the proprietor of a hardware store in Sedalia, had agreed that if plaintiff would convey the house and lot to him, for $5,000, he would transfer to plaintiff's husband an interest of that value in said hardware store, out of the profits of which her husband could maintain his family.

It was mutually agreed at the time that plaintiff and her husband would live apart from each other for an indefinite period. This agreement to live apart and her consent to execute the deed as requested by her husband were obtained after consulting with her father, Mr. McNair.

At the suggestion of her father, and as an earnest of good faith that her husband was obtaining the deed for the purposes he had asserted, her husband gave plaintiff the following written agreement:

"Whereas, I and my wife, Belle McNair Ilgenfritz, have agreed to live separate for a time, she to remain at her father's house, and whereas, she has this day signed a deed conveying to C. E. Ilgenfritz certain house and lots in Sedalia, Mo., the proceeds whereof *have been turned over to me*, the said house and lot having heretofore been paid for by me and the title to the same placed in her name, now, in consideration of the premises, I agree to ' pay to Charles A. McNair, as trustee for my said wife, the sum of $30 per month for each and every month during the time we may remain separated.

"In testimony whereof I have hereunto set my hand and seal this fifth day of December, 1887.

"W. D. ILGENFRITZ.

"The above is to become null and void in case she ceases to live at her father's house or applies for a divorce."

At the time this agreement was signed and delivered, plaintiff and her husband executed the deed to the lot in suit to his brother, C. E. Ilgenfritz, his co-defendant, for the expressed consideration of $5,000. Her husband, with some delays, paid the $30 per month for seven months and then refused to make any other payment. The evidence is uncontradicted that C. E.

Ilgenfritz at the time of the execution of the deed paid nothing for it. He did not sell or transfer to W. D. Ilgenfritz any share in his hardware business at that time. In December, 1888, the plaintiff commenced this action to rescind the deed. In May, 1889, the hardware business of C. E. Ilgenfritz was incorporated and W. D. Ilgenfritz took $3,500 worth of stock in the new company. His explanation of this is that it was found on a settlement that he owed his brother $1,500 and he took stock for the balance due. Nothing whatever was said about this $1,500 of indebtedness at the time the plaintiff made the deed.

It turns out in evidence that since the institution of this suit C. E. Ilgenfritz, the brother, has conveyed all his hardware stock to his mother and two brothers, W. D. and Linn Ilgenfritz, and he has conveyed this lot to his mother. Indeed there cannot be a rational doubt that C. E. Ilgenfritz, up to May, 1889, held the title to the house and lot in suit under a verbal agreement as a trustee for W. D. Ilgenfritz and the mother is a grantee *pendente lite*, with full notice. She lives in the house with W. D. Ilgenfritz and he testified he had no doubt she would convey it back to him at any time his wife would return and live with him. He also gave evidence to the effect that he had endeavored to get his wife to return to him and expressed much affection for her, all of which she very emphatically denied. The plaintiff and her sister testified that plaintiff had charged her husband with tricking her out of the property and that he admitted he had to do so to prevent her mortgaging it. This he denies.

Upon the trial, the defendants sought to interrogate the plaintiff as to where she had gotten the money with which to return to her father's home, and as to what reason she had for leaving her husband and for refusing to return to him, and as to whether or not he

had not asked her to return and had offered to procure a re-conveyance of the property in question, and as to whether her husband had given any reason to her father for discontinuing the monthly payments, to all of which said questions the court sustained objections because the evidence sought was immaterial, and to this the defendant excepted. The court found the issues for the plaintiff and entered a decree annulling the aforesaid deed and re-vesting in the plaintiff the title to the property in question in the same manner and with the same effect as she held it at the date of said conveyance.

I. The conveyance to plaintiff of the lots in suit, by Ittel and wife, was made by the direction of her husband, without suggestion on her part and without any undue influence by her. Under such circumstances, when the deed was executed and delivered to her, that instant the title vested in her, and her husband was powerless to revoke it. There is no evidence that there was any agreement that she was to take and hold the same in trust for him, and in the absence of such proof, the clearly settled rule in this state is that the husband is presumed to have intended it as a provision for and settlement upon her for her own benefit, and not as a resulting trust for himself. 2 Pomeroy's Equity [2 Ed.], sec. 1039; *Schuster v. Schuster*, 93 Mo. 438; *Seibold v. Christman*, 75 Mo. 308; *Seibold v. Christman*, 7 Mo. App. 254; *Price v. Kane*, 112 Mo. 412; *Kinzey v. Kinzey*, 115 Mo. 496. In the further investigation of this cause, then, the house and lots in suit must be, and will be, considered as absolutely the property of the plaintiff, as if she had acquired the same by her own separate means and estate, or by gift or grant from some other source, independent of her husband, and the obtaining of the deed thereto by her husband for his brother must be subjected to the same

rigid scrutiny that would be exercised if the husband had not furnished the money with which the property was bought.

II. The plaintiff in the circuit court, and again in this court, assumes, and we think correctly, that this conveyance of her real estate, being, in fact, all the property of which she was at the time the owner, to her husband (because in equity, it was conveyed to him, his brother being a mere conduit) is presumptively invalid. The jurisdiction of a court of equity attaches, in a case like this, from the fact of the existence of the fiduciary relation, a relation of confidence subsisting between the parties. The courts do not require as essential, any additional circumstances, such as mental weakness, old age, ignorance, pecuniary distress or the like. These conditions may, and often do, accompany transactions between those holding confidential relations, but they are merely incidental, not essential in determining the jurisdiction of equity to interpose and correct any wrong done. The supreme court of Michigan in *Witbeck v. Witbeck*, 25 Mich. 439, said: "It has always been found necessary to examine jealously into all transactions whereby the husband gets an advantage over the wife, not plainly spontaneous on her part."

Pomeroy, in his most excellent treatise on Equity Jurisprudence, says: "The doctrine to be examined arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other *in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites and of thereby overcoming the presumption.*" Sec. 956.

In *Tate v. Williamson*, sec. 956, 1 Law Reports, Equity Cases, 528 (1865-66), SIR W. PAGE WOOD, vice-chancellor, announced the rule as follows: "The broad principle on which the court acts in cases of this description is that, wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the *fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him.*" *Rhodes v. Bate*, Law Report, 1 Ch. App. 252; *Billage v. Southee*, 9 Hare 534-540; *Hatch v. Hatch*, 9 Vesey 292; *Smith v. Kay*, 7 House of Lords Cases 750; *Noble's Adm'r v. Moses Brothers*, 81 Ala. 530; *Huguenin v. Baseley*, 14 Vesey's Chy. 273; *Ranken v. Patton*, 65 Mo. 378; *Garvin's Adm'r v. Williams*, 44 Mo. 476. In no jurisdiction has this rule been followed more rigidly and uniformly than in the courts of Missouri.

Applying the test to this transaction, we have the relation of the most sacred confidence recognized by the law. The common law regarded a married woman as utterly incapable of making a contract with her husband. If the ordinary trustee is to be considered the superior in dealing with his ward, or *cestui que trust*, much more must the husband be considered as the superior in dealing with his wife, and capable of wielding a far greater influence.

The facts surrounding this transaction fully justified the trial judge in finding that while this deed was nominally made to C. E. Ilgenfritz, the brother, it was held by the brother for the husband, until May, 1889. William D., the husband, testifies that *he paid no rent* to C. E. Ilgenfritz; that his brother never paid him

anything for the property except the interest in the store; that prior to May, 1889, there was no definite arrangement as to his acquiring any interest in the store; *"Ed. did not exercise any ownership over the house and lot; there was no valuation put upon the property before the deed was made."* Looking at the substance of things, this husband in December, 1887, obtained from his wife property of the value of $5,000, upon a representation that he had already arranged to have stock to that amount in the hardware business, the profits of which would enable him to support his wife and children.

From this testimony we can come to no other conclusion than that the defendant, husband, intended to and did create the belief on the part of his wife that all that was necessary to consummate the trade which would enable him to provide for her, and her children, was the execution of this deed, and unless she did so, he would be without employment or means; that the other details were settled. In the written agreement he gave her at the time, he states that *the proceeds of the sale to his brother had been already turned over to him.* There is no pretense now, that at that time, nor for fifteen months afterwards, any trade for this house had been made with his brother, or that his brother had paid him one cent therefor.

The argument of the learned counsel for defendant proceeds on the theory that the evidence does not make out a case of fraudulent representation in this, that it fails to state any existing or past facts that were false; that the case depends entirely upon his promises for the future. It seems to us that defendant has failed to note the obvious distinction between the rule of equity governing a transaction between parties standing in a confidential relation and one in which the parties bear no such relation and deal at arm's length.

Ilgenfritz v. Ilgenfritz.

When the plaintiff alleged and proved that the defendant, her husband, had obtained from her a deed to her house and lot, property of the value of $5,000, which had been legally vested in her; that she had only received from him $210, either in payment therefor or as her marital right, for her support, since the execution of that deed; and that this conveyance was made for his immediate benefit at his solicitation and not as her voluntary spontaneous act, equity at once raised a presumption against the fairness and validity of the deed and cast upon defendants the burden of proving affirmatively that the transaction was equitable and just, to overcome the presumption.

The defendant then has the laboring oar in this case. It may be that if he had dealt with someone with whom he bore no confidential relations and the trade had been impeached, the deed might have not been set aside because his opponent relied on his promises, but when called upon to account to a chancellor for the manner in which he obtained all of his wife's estate, it does not satisfy the conscience of the court to have him say, she was weak enough to rely upon his promises, and that *mere promises* do not amount to fraudulent representations. He is required to show that this conveyance was the result of her free will and consent, after a full disclosure of all the facts and circumstances. 1 Story's Equity, secs. 218, 307, 308.

Moreover, the transaction in itself *must be equitable* and just to her. A court of equity will require the utmost good faith on his part as husband. *Leavitt v. LaForce*, 71 Mo. 353. It will not permit him by a mere promise of $30 per month to obtain her title, and then in seven months discontinue the payment. The inadequacy itself in such a case smacks strongly of fraud. It is very clear that when defendant went to St. Louis he had the full benefit of the advice of legal

counsel, *the wife had none and he suggested none.* He took a deed that had been prepared in Sedalia by his lawyer. His representations as to what his brother would do, were not true. It will not do to say these statements were the mere expression of an opinion. The credulous wife did not so regard them. Certainly *the written statement that he had already received the proceeds of the sale* was entirely without foundation. If he had not received the consideration, and had no agreement as he most clearly had not, why was the deed made to C. E. Ilgenfritz? It seems too plain for discussion, that it was a mere subterfuge to regain a title he had been advised was irrevocably vested in the wife. He did not deal candidly or sincerely with her. He was not obtaining the deed for his brother for a share in the store, but he was simply seeking to obtain title for himself. He has not sustained the burden that was on him and has not rebutted the presumption. The trial court with all the parties before it, was better able to weigh the testimony of these parties than we possibly can be. It is a case where we can very properly and consistently defer to his finding on the credibility of the witnesses.

We see no error in refusing to permit the defendant to require plaintiff to tell where she obtained the money to go to her father's house or what her reasons were for going home. Whatever they were, defendant consented she might remain there, and her answers could throw no light upon the issue made by the pleadings, nor divest her of her title.

The trial court, we think, was fully warranted in decreeing that the deed should be set aside. There is no merit in the claim that C. E. Ilgenfritz is an innocent purchaser. He was a defendant in this suit long before he claims to have made the trade or paid his brother one cent. The judgment is affirmed. BARCLAY,

BURGESS and SHERWOOD, JJ., Concur. BLACK, C. J., and BRACE and MACFARLANE, JJ., dissent, in an opinion herewith filed.

BLACK, C. J., (*dissenting*).—Judges BRACE, MACFARLANE and myself do not agree to the opinion just filed, nor to the line of argument therein pursued. In our opinion, the judgment in this case should be reversed and the petition dismissed for want of equity, and our reasons therefor are set out in the following opinion heretofore filed in Division One:

The plaintiff Belle Ilgenfritz is the wife of the defendant William D. Ilgenfritz. She brought this suit in equity against her husband and his brother Edward to set aside a deed made by her and her husband to Edward. The circuit court gave a decree according to the prayer of the petition, and the defendants appealed.

After the plaintiff and William D. Ilgenfritz, hereafter called the defendant, were married, he purchased three lots in the city of Sedalia and had the same conveyed to her by a deed dated in 1884, not as her separate estate as alleged in the petition, but as her general property. The money used in purchasing the lots and in erecting a dwelling thereon, amounting in all to about $5,000, came from his parents as an advancement to him. The plaintiff had no money or property of her own.

The plaintiff resided with defendant in this their home until the thirtieth of November, 1887, at which time she left him and went to her father's home in the city of St. Louis. On the fifth of December, being about a week after she left, she and her husband conveyed the house and lots to his brother Edward for the recited consideration of $5,000. At the same time the

defendant signed and delivered to her father, Mr. McNair, the following agreement:

"Whereas I and my wife, Belle McNair Ilgenfritz, have agreed to live separate for a time, she to remain at her father's house; and whereas, she has this day signed a deed conveying to C. E. Ilgenfritz certain house and lots in Sedalia, Mo., the proceeds whereof have been turned over to me, said house and lots having heretofore been paid for by me and the title to the same placed in her name. Now in consideration of the premises I agree to pay to Chas. A. McNair as trustee for my said wife, the sum of $30 per month, for each and every month during the time we may remain separated. The above is to become null and void in case she ceases to live at her father's house, or applies for a divorce."

The defendant, with some delays, paid the $30 per month for a period of seven months, and then refused to make any further payments. She then commenced this suit in December, 1888, to set aside the deed so made by her and her husband to Edward. She states in her petition that she and defendant agreed to live separate "for a time;" that he represented to her that he had no property and was unable to support her and the children of their marriage from the small salary which he was receiving; that if she would convey the property to his brother Edward, the latter would convey to him a stock of goods in Sedalia of the value of $5,000; that with the stock of goods he would be able to make her an allowance; that relying upon these representations and believing them to be true, she joined him in the deed to Edward; that the representations were false and fraudulent and a scheme devised by him and Edward to cheat her out of her property; and that Edward did not convey to her husband the stock of goods.

Ilgenfritz v. Ilgenfritz.

At and before the date of the deed, the defendant was in his brother's employ in a hardware store in Sedalia. It appears the defendant and the plaintiff did not live in harmony and had had their differences for some time. She left him twice and went to her father's in St. Louis, the last time on the thirtieth of November, 1887, taking with her one child about four years old, leaving the two younger children, one a babe, at Sedalia. She had declared some days before, her intention to leave him, but she says he did not know that she was going to leave on the day she left. She took the train without his knowledge or consent. In a day or so he followed her and endeavored to pursuade her to return to their home, but she refused. In the course of a week he returned to St. Louis with the deed now in question prepared and requested her to sign it. After one or two visits to the house, she, her sister and the defendant went to her father's office. Mr. McNair relates what transpired there in substantially these words: "They all came to my office together. He wanted my daughter to sign the deed and she conferred with me about it. She declined making the deed, unless he gave her some consideration for it. He said his brother was going to sell out the hardware business and if he could get Belle to make the deed to his brother, he would be allowed $5,000 in the purchase of the store, and that would enable him to make money enough to support his wife and children; that he wanted to give her sufficient to support her while she remained in St. Louis. He suggested $50 per month, and I objected to that as being too much, and reduced the amount to $30 per month, because I believed that to be the rental value of the house. After that we went across the street to a notary's office and my daughter signed the deed. I wrote the contract there in his presence and he signed it. In the following July 1

asked him if his brother had transferred to him the $5,000 interest in the store, and he said he had not, but would do so at any time. He had then neglected to make the payments when due."

The plaintiff and her sister testified that defendant was at their house in St. Louis in April, 1888, when the plaintiff said to him "you tricked me nicely out of that property," and he said "yes I did. I had to do it, or I could not get it. I was afraid you would mortgate it." The defendant says the plaintiff accused him of swindling her out of the property, and he said "Belle, if you had kept the property in your name, you would have mortgaged it away from the children," and that this was all he said; that it was useless to say more at that time and on that occasion.

The proof shows that defendant continued in the employ of his brother on a salary the same after as before the date of the deed; and that he continued to occupy the house, paying Edward no rent therefor, his mother keeping house for him. The proof is clear that he had and received no interest in the store until May, 1889, which was after the institution of this suit. At the last named date the hardware stock and business were turned over to a corporation, and defendant received stock in the corporation to the amount of $3,500. He says his family expenses had been in excess of his salary at the date of the deed and contract in question, and when he came to figure up the accounts, he owed his brother Edward $1,500; that this sum was deducted from the $5,000 consideration specified in the deed and he took stock for the remaining $3,500. At this date Edward conveyed the house and lots to his mother, to whom, it is alleged, he was indebted for money borrowed of her.

The deed and contract in question bear date the fifth of December, 1887, while this stock was not

turned over to defendant until May, 1889. As to this the defendant testified: "When the deed was executed I thought we might live together. I could have had an interest in the store at any time from that date on, but I thought best to let the property stand, and if she came back I would have a home. I kept the matter open by agreement, in hopes my wife would come back, until May, 1889." Indeed, the defendant testified on the hearing of this case: "I think my mother would let me have the property back at any time that my wife consents to come back and live with me, and take care of the home. My mother takes care of the children and lives out at the house."

As to the representations made at the execution of the deed and contract, the defendant testified: "I do not think I told them that I had any agreement made with my brother Edward, but I told them I could make an agreement." Edward testified that the matter of his brother taking an interest in the store had been talked over before the plaintiff left her husband, and his evidence shows that he knew the deed had been made to him for the purpose of giving the defendant an interest in the store. He says the trade was consummated in May, 1889.

Nothing was said about the $1,500 due from defendant to Edward at the time the deed and contract were signed at Mr. McNair's office. The proof shows that the plaintiff incurred $600 of this indebtedness for dresses and the like at the time she first left her husband. She concedes that she made bills to that amount for such purposes, but says she was not informed at the time she signed the deed that her husband owed Edward any larger amount.

The plaintiff says in her testimony that she formed the intention to remain away from her husband permanently after she reached St. Louis. She was asked

on cross-examination what cause she had for leaving her husband, but her counsel interposed objections and the court excused her from answering the questions. She says she had money to pay her expenses on that trip, but she declined to say where she got it. As this record now stands, there is nothing to show why she left her husband or that she had any cause for so doing. Such is in substance and effect the case now in hand.

It is to be observed at the outset that the facts as disclosed by the evidence are materially different in several respects from the facts as they are alleged in the petition. Thus the property was the general, not the separate estate of the plaintiff, and she therefore held it subject to the marital rights of her husband. Again, the plaintiff furnished no part of the money used in purchasing and improving the lots, though the contrary is alleged in the petition. The petition disregards and ignores the contract whereby defendant agreed to pay Mr. McNair $30 per month for the use of the plaintiff.

The relation of husband and wife is one of great confidence and trust, and he is regarded as the stronger and the natural protector of the wife. This power and influence possessed by the husband gives him special opportunities to deal unfairly with her; and out of all this arises the rule that courts will closely scrutinize transactions by which he obtains the property of the wife. To avoid such a transaction, the improper influence need not proceed so far as it must where no such confidential relation exists. Bishop on Married Women, Chap. 35. As said in *Witbeck v. Witbeck*, 25 Mich., 439: "The law recognizes the fact that a married woman is easily subjected to a species of coercion, very much more effectual than any ordinary operation of fear or fraud from strangers. It has always been found necessary to examine jealously into all transactions whereby the husband gets an advantage over the wife,

not plainly spontaneous on her part. Any undue advantage gained by the use of the marital relation is a legal fraud on the wife, which courts of equity will not allow to stand to her prejudice." See also 1 Story Equity, sec. 218. This principle of law is so well established that it is deemed unnecessary to cite further authorities. But its application depends much upon the circumstances of the particular case.

In the case now in hand, the deed which the plaintiff seeks to set aside, and the contract to pay her the stipulated sum per month were both executed after she had left her husband, and while she was under the protection of her father and at his house. She says she had then formed the intention to remain permanently away from him. She called upon her father for and received his advice in the matter of signing the deed. It must be apparent that this case is quite unlike one where the husband induces the wife to join in a deed while she is under his roof and subject to his influence. With these observations in mind, we proceed to the consideration of the alleged fraudulent representations.

Mr. McNair states in his evidence that his daughter, the plaintiff, refused to sign the deed, unless paid a consideration therefor. The defendant then said his brother, Edward, was going to sell his hardware business, that if Belle would join in the deed conveying the property to Edward, he would be allowed a $5,000 interest in the hardware store, and this would enable him to retain a position in the store and make enough money to support his wife and children, and he suggested an allowance to her of $50 per month. But the matter did not stop here. Mr. McNair prepared and defendant signed the agreement to pay for her use $30 per month. It is manifest that this agreement to pay the $30 per month constituted the real inducement for

executing the deed.   As a deceit, to be actionable, must relate to existing or past facts, the breach of a promise to pay in the future is not of itself a fraud.   Cooley on Torts [2 Ed.], p. 569.   The fact, therefore, that defendant made breach of his agreement to pay the $30 per month does not of itself furnish any reason for setting aside the deed.

From the evidence of Mr. McNair we are unable to see a single representation as to an existing or past fact.   The representations made by defendant all relate to what he could and would do in the future, if his wife joined him in the deed.   They amount to nothing more than an expression of his intention to do certain things by which he would be able to make the promised payments.   They are the statements of his intention, hope and expectation, coupled with the promise to pay the specific sums of money, and nothing more, as we view them.   Now, it is well settled both at law and in equity that a misrepresentation must be an affirmative statement; and that a mere statement of an intention, hope or expectation cannot be a misrepresentation amounting to a fraud, for no one has a right to rely upon such a statement.   2 Pomeroy's Equity Jurisprudence [2 Ed.], secs. 877, 891; Bispham's Principles of Equity [4 Ed.], sec. 211.

The whole case, so far as the alleged misrepresentations are concerned, resolves itself into this, that the plaintiff executed the deed knowingly and under her father's advice in consideration of the agreement of the defendant to make the stipulated monthly payments.   He made the payments for seven months, and then refused to further comply with the terms of the contract.   Had he continued the payments, this suit would not have been instituted.   This is manifest. The case is, therefore, simply one of a breach of contract, and we have seen that a breach of promise

furnishes no reason for setting aside a deed. The remedy is an action on the contract. We may add that a false promise is sometimes a device resorted to for the purpose of accomplishing a fraud, as in case of a purchase of goods with an intention not to pay for them. Courts will, of course, grant the proper relief in such cases. But the petition in this case is not framed on any such theory of fact or law.

We think it must be conceded from the evidence of the defendant himself that his brother Edward held this property for his use and benefit, and it may be the mother so holds it at this day, but we do not see how this fact furnishes any ground for the relief asked here by the plaintiff. As we have said, she executed the deed because of and in consideration of the agreement of defendant to pay for her use the stipulated monthly allowance, and the breach of that contract does not of itself make the whole transaction fraudulent.

But it is suggested that the consideration paid and agreed to be paid is so grossly inadequate as to be evidence of fraud and undue advantage obtained by the defendant over his wife. At first blush this point would seem to be well taken, but in disposing of this proposition we must look to all of the circumstances as they existed when the deed was made. The defendant purchased these lots and paid for them and had the house erected thereon out of his own means, and while this fact furnishes no excuse for any undue advantage obtained by him over her, still it is a fact worthy of notice, and it is a fact which found recognition in the contract prepared for him to sign and which he did sign. Again, this was her general property, in which he had his marital rights. She could not convey it without his consent; and though she left him, he had the right to occupy and enjoy the property. It is the duty of a

wife to live with her husband and to make his home her home, and to give to him her society and services, unless she can show reasons which are valid in law, relieving her of these duties. Here the plaintiff left her husband and the home which he had prepared for her, without his knowledge or consent, and she asserts that it is her purpose to remain permanently away from him. No reason whatever is assigned for such conduct. Whatever the real fact may be, we must take it as conceded by this record that she had no just reason whatever for leaving her husband, and that she is guilty of an inexcusable breach of her marital duties. Under all these circumstances, we cannot say the consideration agreed to be paid to her is so inadequate as to be sufficient proof of a fraud perpetrated by him.

After all, we come back to the main proposition and that is this, that the plaintiff was ready and willing to join in the deed for the promises of her husband set forth in the contract signed by him, and on that contract she must stand.